UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
 |
DORCHESTER FINANCIAL SECURITIES, INC. |
 |
              Plaintiff, |
 |
   -against-                                                   |      11 Civ. 1529 (KMW) (KNF)
 |
BANCO BRJ, S.A. |      **OPINION & ORDER**
 |
              Defendant. |
---------------------------------------------------------------X
KIMBA M. WOOD, U.S.D.J.:

      Plaintiff Dorchester Financial Securities, Inc. ("Dorchester")[1] brings this diversity action against Defendant Banco BRJ, S.A. ("BRJ") for breach of contract and fraud in connection with a letter of credit it alleges was extended to it by BRJ.  BRJ moves to dismiss Dorchester's claims, arguing that: (1) this Court lacks personal jurisdiction over BRJ, pursuant to Federal Rule of Civil Procedure 12(b)(2) ("Rule 12(b)(2)"); (2) this Court lacks subject matter jurisdiction over the action, pursuant to Federal Rule of Civil Procedure 12(b)(1); and (3) Dorchester's claims are time-barred by the New York statute of limitations governing actions sounding in contract and

---

[1] Plaintiff initially captioned itself as "Dorchester Financial Securities, Inc." but changed its name in the amended complaint to "Dorchester Financial Holdings Corporation formerly known as Dorchester Financial Securities, Inc."  The change was intended to address the argument proffered by BRJ in its original motion to dismiss that, pursuant to 28 U.S.C. § 1332, Dorchester Financial Securities, Inc. was not a "citizen of a state" at the time the complaint was filed because it was not yet incorporated, and that this Court therefore lacks subject matter jurisdiction over the action.  (*See* Dkt. No. 11.)  Dorchester argues that the amendment was intended to clarify that it brings this action on behalf of a now-dissolved entity, Dorchester Financial Securities, Inc., which changed its name to Dorchester Financial Holdings Corporation prior to dissolution, but after filing an earlier action against BRJ in 2002 based on the same events at issue in the current action.  *See* Part I.B, *infra*.  BRJ argues that Dorchester Financial Holdings Corporation is therefore a different plaintiff than the plaintiff in the 2002 action and is time-barred from bringing the action.  However, because the Court finds that it lacks personal jurisdiction over BRJ, *see* Part III, *infra*, it need not determine whether there is continuity between the Dorchester entity that brought the 2002 action and the Dorchester entity that brings the current one.

1

fraud, such that they must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).
For the following reasons, the Court GRANTS BRJ's motion to dismiss.

## I. Background

### A. Facts[2]

BRJ is a foreign financial institution located in Rio de Janeiro, Brazil.  (Compl. ¶ 2.)
Dorchester is a Florida corporation with an office in New York.  (Compl. ¶ 3.)  Dorchester
alleges that it was incorporated for the sole purpose of obtaining a letter of credit from BRJ,
which would be used to "raise capital for an affiliated company to perform an insurance project."
(Affirmation of TJ Morrow in Support of Pl.'s Opp. to Def.'s Mot. to Dismiss (hereinafter
"Morrow Aff.") ¶ 2.)  Dorchester states that it was first introduced to BRJ by a company called
Africa Capital Partners Investments Limited ("ACP"), which offered to lend Dorchester certain
of its assets as security for a $100 million letter of credit from BRJ, in return for a share of the
capital Dorchester raised.  (Morrow Aff. ¶ 4).

Dorchester, through an affidavit submitted by its accountant, Robert Cox ("Cox"), states
that it was "concerned about [BRJ's] capitalization and assets relative to the proposed size of the
letter of credit."  (Decl. of Robert Cox in Supp. of Pl.'s Opp. to Def.'s Mot. to Dismiss
(hereinafter "Cox Decl.") ¶ 3).  Dorchester therefore requested a conference call with BRJ
officers to discuss this issue, among others.  (Morrow Aff. ¶ 4.)  According to Dorchester, an
ACP officer "arranged a conference call with a Mr. Quieroz and Mr. Alcazar, both [BRJ]
officers."  (Morrow Aff. ¶ 5.)  During that call, Alcazar identified himself as the BRJ officer in
charge of international banking.  (Morrow Aff. ¶ 5.)  He "discussed [BRJ's] willingness to issue
the letter of credit but that the fee must be paid in advance."  (*Id.*)  Alcazar stated that they were

---

[2] The following facts are taken from Dorchester's First Amended Complaint ("Compl.") and accompanying affidavits and are assumed to be true for purposes of BRJ's motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

2

"willing to hold ACP assets as security to issue the letter of credit . . . . [because] ACP accounts were substantial" and "[BRJ] had the necessary comfort from the relationship to act in that way." (*Id.*)  The man who identified himself as Quieroz stated that he was "a [BRJ] board member as well as an officer." (*Id.* at ¶ 6).  Quieroz "conducted himself like Mr. Alcazar was in charge and running the deal," and "at no time did he call into question Mr. Alcazar's authority as the chief international officer." (*Id.*)

Thereafter, Dorchester decided to move forward with the transaction on the condition that the parties sign a letter agreement ("the Agreement"). (*Id.* at ¶ 7.)  ACP drafted the Agreement, which Dorchester reviewed and approved after making several changes, including the addition of a forum selection clause. (*Id.*)  The Agreement, dated October 3, 2001, provided that ACP would apply for the $100 million letter of credit from BRJ, but that Dorchester would be the beneficiary. (Mem. of Law in Opp. to Def.'s Mot. to Dismiss (hereinafter "Pl.'s Mem."), Ex G.)  The Agreement further provided that Dorchester was to pay ACP a $500,000 fee upon execution of the contract, prior to BRJ's issuance of the letter of credit. (*Id.*)  The Agreement is signed by "Thierry Cominassi, Director, ACP Investments Ltd.," "Stanley Ford, President, Dorchester Financial Securities, Inc.," and "Luis Alcazar, Senior Manager, International Department, Banco BRJ, S.A." (*Id.*)

Dorchester alleges that it directed Cox to wire the fee to BRJ.  Although the fee was ultimately sent to ACP, it is not clear, and Dorchester does not explain, why BRJ acted as an intermediary for the payment.  Cox avers that he called "BRJ's main switchboard" and was ultimately referred to Quieroz, who in turn referred him to "a person in the international department," who supplied him with coordinates to an ACP account. (Cox Decl. ¶ 6.)  Cox then wired the fee and received a receipt for the transfer. (*Id.*; Pl.'s Mem., Ex. F.)

3

Dorchester alleges that BRJ then sent a message to Chase Manhattan Bank through the Society for Worldwide Interbank Financial Telecommunication ("SWIFT"), which is a Belgian messaging service specializing in the transmission of financial messages, called "SWIFT messages," between banks and other financial institutions. (Compl., Prelim. Stmt.) The message was labeled "unauthenticated" and contained a warning that "If authentication is required – do not process!!! Under no circumstances should a financial bearing transaction be processed in response to this message!!!" (Pl.'s Mem., Ex. J.) The text of the message stated that BRJ had issued the letter of credit and would reserve it from the date of issue to the date of expiration or maturity. The message further stated that it was signed by two BRJ bank officers, "Luiz Augusto de Quieroz," and "Luis Alcazar," and included their individual SWIFT codes. (*Id.*)

Dorchester alleges that it then received from BRJ a copy of the letter of credit, which stated that the amount of credit was $250 million, rather than the $100 million provided for in the Agreement. (Compl., Prelim. Stmt.) When Dorchester pointed out the error, "[BRJ] reassured Dorchester that as long as smaller amounts were sent to any lender . . . the large amount . . . would not become a problem." (*Id.*) Satisfied with this representation, Dorchester "acquiesced and made arrangements to use the letter of credit." (*Id.*)

On or about October 21, 2001, Dorchester attempted to use the letter of credit as collateral for a loan and requested that BRJ extend to it amounts of $25 million or less. (Morrow Aff. ¶ 8.) Dorchester alleges that BRJ demanded an additional $250,000 fee to perform the transaction. (*Id.*; Compl., Prelim. Stmt.) Dorchester states that it protested but ultimately paid $100,000 to BRJ. (Compl., Prelim. Stmt.; Morrow Aff. ¶ 8.) Dorchester further alleges that it thereafter demanded performance, from November 2001 until July 2002, but that BRJ "stalled

4

and promised performance but did nothing . . . ." (Compl., Prelim. Stmt.) Dorchester states that on or about July 17, 2002, BRJ told Dorchester that it had canceled the letter of credit.

Dorchester then "did an investigation of [BRJ] and found that they were involved in several fraudulent transactions and accused of taking money for the issuance and/or assignment of banking instruments. . . . Before filing [an action with this Court in September 2002], Dorchester knew that [BRJ] was involved in many fraudulent and illegal activities and noticed that there were many documents circulating on the web incriminating [BRJ] as a purveyor of fraudulent documents and forgeries." (Compl., Prelim. Stmt.) In September 2002, Dorchester filed a complaint against BRJ in this Court. (*Id.*) By this time, it "had realized that the letter of credit was fraudulent." (Morrow Aff. ¶ 12.)

### B. Procedural History

On September 17, 2002, Dorchester filed an action against BRJ and SWIFT in this Court based on the same events giving rise to the instant Complaint. *See Dorchester Fin. Secs. v. Banco BRJ S.A. & Soc. for Worldwide Interbank Fin. Telecomm. (S.W.I.F.T.)*, No. 02 Civ. 7504 (S.D.N.Y. 2002). SWIFT appeared and successfully moved to dismiss the allegations against it. BRJ failed to appear in that action despite being properly served. This Court entered a default judgment against BRJ on November 7, 2002. Following an inquest, a final judgment was entered against BRJ in the amount of $ 112,279,452.05 on January 16, 2004. Upon attempting to enforce the judgment in Brazil, where BRJ is located, Dorchester learned that it would be unable to do so because a default judgment from a United States court is not enforceable against a Brazilian defendant unless process was served in that action by letters rogatory. Upon a showing by Dorchester that post-judgment service by letters rogatory could be perceived as tainted or unfair by the Brazilian legal system, this Court granted Dorchester's motion to vacate the default

judgment it had secured, and it permitted Dorchester to refile the action. On March 7, 2011, Dorchester filed a Complaint in this action, (Dkt. No. 1), which was superseded by a First Amended Complaint filed on August 31, 2011. (Dkt. No. 24.) On September 16, 2011, BRJ filed the instant motion to dismiss. (Dkt. No. 27.)[3]

## II. Legal Standards

### A. Rule 12(b)(2) Motion to Dismiss Standard

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (internal quotation omitted). Where, as here, "a court relies on pleadings and affidavits, rather than conducting a full-blown evidentiary hearing, the plaintiff need only make a *prima facie* showing that the court possesses personal jurisdiction over the defendant." *Id.* (internal quotation omitted).[4] All pleadings and

---

[3] BRJ also moved to dismiss the original Complaint and relies primarily on the briefs it submitted in support of that motion, adding only one additional argument in the briefs submitted in support of the instant motion. Dorchester seeks to exclude the new briefs on the ground that they are "supplemental responses" to the briefs submitted by the parties for the first motion to dismiss. The Court rejects this argument; upon Dorchester's submission of an amended complaint, BRJ was entitled to file a new motion to dismiss and new briefs in support of that motion. BRJ is entitled to rely on the earlier briefing and to supplement that briefing with additional arguments. Dorchester is entitled to do, and has in fact done, the same with respect to its briefing. The Court therefore considers the arguments advanced by the parties in both the initial and the instant motions to dismiss. *See, e.g.*, *Harrison v. N.Y. City Admin. for Children's Servs.*, No. 02-Civ. 0947, 2002 WL 2022932, at *1 (S.D.N.Y. Sept. 3, 2002) (Ellis, J.) (permitting defendant to incorporate by reference any portion of brief filed in support of its motion to dismiss original complaint and to include supplemental arguments in response to amended complaint filed during pendency of original motion to dismiss).

[4] Affidavits and other documentation outside of the pleadings may properly be considered on a motion to dismiss for lack of personal jurisdiction. A "Rule 12(b)(2) motion is inherently a matter requiring the resolution of factual issues outside of the pleadings . . . [such that] all pertinent documentation submitted by the parties may be considered in deciding the motion." *Pilates, Inc. v. Pilates Institute, Inc.*, 891 F. Supp. 175, 178 n.2 (S.D.N.Y. 1995) (Wood, J.) The consideration of extrinsic materials does not require the Court to convert the motion into a motion for summary judgment, as would be required for a Rule 12(b)(6) motion, as "it is well-settled that in considering jurisdictional motions, the Court may consider evidence outside the

6

affidavits are to be construed in the light most favorable to the plaintiff, and any ambiguities therein must be resolved in its favor. *Id.* However, where a "'defendant rebuts [a] plaintiff['s] unsupported allegations with direct, highly specific testimonial evidence regarding a fact essential to jurisdiction—and [the] plaintiff[ ] do[es] not counter that evidence—the allegation may be deemed refuted.'" *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 420 (S.D.N.Y. 2006) (Chin, J.) (quoting *Schenker v. Assicurazioni Genereali S.p.A., Consol.*, No. 98 Civ. 9186(MBM), 2002 WL 1560788, at *3 (S.D.N.Y. July 15, 2002) (Mukasey, J.)).

In diversity actions such as this one, personal jurisdiction over a non-domiciliary is determined according to the long-arm statute of the forum state, which in this case is New York. *See DiStefano*, 286 F.3d at 84. New York's long-arm statute provides, in relevant part, that a court may exercise personal jurisdiction over a non-domiciliary defendant where that defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state " if the cause of action arises from such activity.[5] N.Y.C.P.L.R. § 302(a)(1). A non-domiciliary transacts business under § 302(a)(1) when it "purposefully avails [itself ] of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws." *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). Such activities may be contrasted with "random, fortuitous, or attenuated contacts, . . . [or] unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (internal quotations omitted).

---

pleadings in reaching its decision without necessitating the use of Rule 56." *Id.* (internal quotation omitted).

[5] For purposes of § 302(a)(1), "[a] cause of action 'arises out of' a defendant's transaction of business in New York . . . when there exists an 'articulable nexus' or a 'substantial relationship' between transactions occurring within the state and the cause of action sued upon." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004).

Whether the defendant has engaged in some purposeful activity in New York in connection with the matter in controversy is determined by the totality of the circumstances. *See Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007). Where jurisdiction is alleged based on a contract, a court may look to the following non-exhaustive factors, none of which is dispositive: "(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004).

## III.  Discussion

Dorchester argues that this Court may exercise personal jurisdiction over BRJ based on Dorchester's allegation that BRJ signed the written Agreement purporting to issue a letter of credit, and that the Agreement (a) "contained a choice of law clause making New York the place to adjudicate any claims" and stated that "[a]ll parties agreed to personal jurisdiction in New York;" (b) stipulated that the letter of credit was to be issued in US dollars; and (c) was addressed to Dorchester's New York office. (Compl. ¶ 4.) BRJ argues that personal jurisdiction is lacking because Dorchester never actually transacted with BRJ; rather, it interacted only with persons masquerading as BRJ officers. (Def.'s Mem. of Law in Supp. of Mot. to Dismiss (hereinafter "Def.'s Mem.") at 14.) Specifically, BRJ alleges that (a) it has no record of any relationship with Dorchester or ACP; (b) it has never issued the type of financial instrument such as the purported letter of credit; (c) the signatures on the documents are forgeries; (d) Luis

8

Alcazar ("Alcazar") was never an employee of BRJ; and (e) BRJ has been the victim of similar frauds, including one that also involves an individual named "Luis Alcazar," in criminal and civil cases in Florida and California, respectively. (Reply Mem. in Supp. of Def.'s Mot. to Dismiss (hereinafter "Def.'s Reply Mem") at 2.) BRJ has offered an overwhelming amount of "direct, highly specific testimonial evidence," to support these claims, none of which Dorchester has sufficiently refuted. *Merck & Co., Inc.*, 425 F. Supp. 2d at 420. To the contrary, the facts and evidence Dorchester has proffered support a finding that BRJ was never involved in the events giving rise to this cause of action.

BRJ's primary evidence consists of affidavits submitted by Luiz Augusto de Quieroz ("Augusto de Quieroz"), who has been a member of BRJ's Board of Directors since 1984. (Declaration of Luiz Augusto de Quieroz in Supp. of Def.'s Mot. to Dismiss (hereinafter "Augusto Decl.") ¶ 2.) Augusto de Quieroz declares, under penalty of perjury, that BRJ provides bank guarantees, credit, and loans "exclusively in the domestic (Brazilian) market," and that BRJ has never conducted business in New York or in the United States, has no employees or offices in New York, is not licensed or qualified to do business in the state, has no accounts with banks or investment firms in the state, and has never issued a letter of credit to a New York or United States beneficiary.[6] (Augusto Decl. ¶¶ 3-8.) Dorchester does not refute these statements.

Augusto de Quieroz further avers that BRJ's "total portfolio of non-mortgage instruments is approximately $100 million," and that BRJ has "never entered into a single obligation even close to the $250,000,000 principal amount that is in the purported letter of credit . . . ." (Augusto Decl. ¶ 3.) The evidence submitted by Dorchester supports, rather than refutes, BRJ's statements on this point. The unlikelihood of a $250 million investment from a bank with an asset base less

---

[6] The Complaint has not alleged that BRJ is subject to general personal jurisdiction in New York. Even if it did, these statements, which Dorchester does not refute with any evidence, are sufficient to establish that BRJ has no "presence" in the state that would subject it to general jurisdiction under C.P.L.R. § 301.

9

than half that size was not lost on Dorchester at the time they entered into the alleged Agreement. In his declaration, Dorchester's accountant avers that upon reviewing BRJ's financial statements prior to entering into the transaction, he "was concerned about the bank's capitalization and assets relative to the proposed size of the letter of credit . . . [because] the asset base was very small in relation to the proposed letter of credit."  (Cox Decl. ¶¶ 3-4.)  He further states that he "thought it was unwise for Dorchester to proceed with the transaction . . . ."  (*Id.* ¶ 4.)  This sentiment is also echoed in a declaration submitted by Dorchester's financial "expert," Don Coker, who states that he "find[s] it beyond comprehension that in 2001 a bank of that size could issue a letter of credit for $250 million dollars."  (Decl. of Don Coker in Supp. of Pl.'s Opp. to Def.'s Mot. to Dismiss (hereinafter "Coker Decl.") ¶ 4.)

   Both Augusto de Quieroz and his brother Luis Claudio de Quieroz ("Claudio de Quieroz"), another member of BRJ's Board of Directors, further declare that BRJ has neither heard of nor transacted with ACP, Dorchester, or any of their representatives.  (Augusto de Quieroz Decl. ¶ 10; Decl. of Luiz Claudio de Quieroz in Further Supp. of Def.'s Mot. to Dismiss (hereinafter "Claudio Decl.") ¶ 6.)  They both aver that BRJ has no records relating to any Dorchester or ACP entities; that it has never had a client or customer named ACP; that it has never held assets owned by a company with that name; and that it has never received wire transfers from ACP or Dorchester.  (Reply Decl. of Augusto de Quieroz in Further Supp. of Def.'s Mot. to Dismiss (hereinafter "Augusto Reply Decl.") ¶ 3, 14; Claudio Decl. ¶ 6, 17.) Augusto and Claudio de Quieroz state that they never participated in the conference call that Dorchester alleges occurred in September 2001, and that they never had phone calls with Cox to

arrange for payment of fees due under the Agreement.[7] (*Id.*) Dorchester has not provided any evidence to refute these statements; rather, it conclusorily argues that because the individual with whom its representatives spoke was identified as a "Mr. Quieroz" and a BRJ board member, that individual must in fact have been Augusto or Claudio de Quieroz.

BRJ also disputes the authenticity of the October 3, 2001 Agreement that purports to authorize issuance of the letter of credit. Both Augusto and Claudio de Quieroz state that BRJ has no knowledge of the Agreement, which was signed purportedly on behalf of BRJ by Alcazar only. (Augusto Reply Decl. ¶ 7; Claudio Decl. ¶ 8.) They aver that the document is a forgery because: (1) the BRJ seal on the Agreement is "not the seal used by BRJ in October 2001, [which] at that time contained BRJ's . . . number of company registry in Brazil"; (2) Alcazar is not an employee of BRJ; and (3) Alcazar's lack of authority is further illustrated by the fact that BRJ does not have an "International Department," of which Alcazar purports to be the Senior Manager. (Augusto Reply Decl. ¶ 7; Claudio Decl. ¶ 10.) Augusto de Quieroz further declares that Alcazar "was an independent broker who presented business opportunities to BRJ between 1998 and 2000. We never consummated a single transaction that Mr. Alcazar presented to us and we had no relationship with him whatsoever as of the 2001 date of the alleged letter of credit." (Augusto Decl. ¶ 16.)

Dorchester has not presented any evidence to refute this "direct, highly specific testimonial evidence." *Merck & Co., Inc.*, 425 F. Supp. 2d at 420. Dorchester merely argues that because the individual who identified himself as "Mr. Quieroz" never "call[ed] into question Mr. Alcazar's authority as the chief international officer," that Alcazar was therefore given the apparent authority to bind BRJ. (Pl.'s Mem. at 4.) However, it is axiomatic that apparent

---

[7] Dorchester alleges that a BRJ board member named "Mr. Quieroz" participated in these calls but does not specify whether that individual was Augusto or Claudio de Quieroz. Both have averred, under penalty of perjury, that they did not participate in any of the calls.

11

authority can be conferred only by an actual principal. *See, e.g.*, Restatement (Third) of Agency 2.03 (2006) ("Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal *and that belief is traceable to the principal's manifestations*." (emphasis added)).  Dorchester has not refuted BRJ's evidence that the person who identified himself as "Mr. Quieroz" was not in fact Augusto or Claudio de Quieroz, or any other BRJ official who could confer authority upon an agent.  Absent any evidence that "Mr. Quieroz" was actually a BRJ official, his statements cannot serve as the basis for Alcazar's apparent authority.  *See Hallock v. State of New York*, 64 N.Y.2d 224, 230 (1984) ("Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction.  The agent cannot by his own acts imbue himself with apparent authority.")

BRJ also offers evidence to negate the authenticity of the SWIFT message, which purports to bear the signatures of Alcazar and Augusto de Quieroz.  Augusto de Quieroz declares that neither he nor anyone else at BRJ sent the SWIFT message, and that the personal SWIFT code listed on the document is not, nor has ever been, his personal SWIFT code.  (Augusto Reply Decl. ¶ 9.)  Claudio de Quieroz similarly avers that BRJ did not send the message and confirms that the personal SWIFT code listed under Augusto de Quieroz's name is not, nor has ever been, Augusto's SWIFT code or that of any other BRJ employee.  (Claudio Decl. ¶ 12.)

To contest this evidence, Dorchester offers Coker's "expert testimony," in which Coker states that "the 2-page SWIFT message . . . contains enough identifying information about the sender such as SWIFT codes, bank name inserts and bank location inserts to make a verification.  In my opinion Banco BRJ sent this message . . . [and] either Luis Alcazar or Luiz Augusto de

Quieroz or both ordered the message sent to Chase Bank." (Coker Decl. ¶ 4.) Coker's opinion appears to be based on the principle that since "banking practice norms require that a wire transfer clerk send out SWIFT messages for an officer and includes the name of the officers(s) that ordered the message sent," Alcazar and/or Augusto de Quieroz, whose names are listed on that message, are therefore the officers who sent the SWIFT message. This conclusory allegation is insufficient to contest BRJ's "direct, highly specific testimonial evidence" that the message is a forgery.[8]

With respect to the actual letter of credit, Augusto de Quieroz points out a number of indicia of forgery: (1) the "Letter of Credit Number" listed on the copy submitted by Dorchester does not conform to the numbering system it uses to issue financial instruments; (2) BRJ issues instruments in Portuguese only, whereas the letter submitted by Dorchester is in English; (3) the font type on the document is different from the one BRJ uses; and (4) "BRJ did not issue any kind of financial guarantees in 2001 remotely similar to that in the alleged letter of credit, regardless of dollar amount." (Augusto Decl. ¶ 11-12.) Furthermore, both purported signatories to the document, Augusto and Claudio de Quieroz, swear that they did not sign the letter of credit, and that the signatures on the document are forgeries. (Augusto Decl. ¶ 13; Claudio Decl. ¶ 3.) BRJ has submitted a number of documents bearing samples of the signatures of both Augusto and Claudio de Quieroz; those signatures do not bear any resemblance to the signatures on the letter of credit submitted by Dorchester. (Augusto Decl., Exs. A-B.) Dorchester has not

---

[8] Dorchester also argues that the SWIFT message was sent by BRJ because (1) Chase "verified in writing" that BRJ sent the message by presenting the message to Dorchester, and "verbally admitt[ed] to Dorchester's attorney that Banco sent the SWIFT message"; and (2) SWIFT, in its motion to dismiss the case against it, stated that "the message originated at Banco BRJ." (Pl.'s Mem. at 7.) With respect to Chase's "written" confirmation, the mere presentation of the message it received, from an "unauthenticated" source, hardly constitutes an admission that BRJ was the sender. As to Chase's "verbal" admission, Dorchester offers no evidence to support its claim. Finally, Dorchester improperly relies on SWIFT's statement that the message originated at BRJ. SWIFT's memorandum of law in support of its motion to dismiss clearly states it "relies, as it must, on the statement of facts alleged in the Complaint." (Pl.'s Mem., Ex. I at 8.) SWIFT's statement is not evidence that the message was sent by BRJ.

offered any evidence to refute the de Quierozs' sworn statements or prove the authenticity of the letter of credit.

Finally, BRJ submits evidence from criminal and civil proceedings in other districts involving forged BRJ documents nearly identical to the ones at issue in this action. These documents further support a finding that BRJ was not involved in the Dorchester transaction. For instance, in 2006 the Florida Attorney General's office sought assistance from BRJ for the prosecution of individuals who "fraudulently represented to victims that [they] . . . had credit relationships with foreign banks, including Banco BRJ, Brazil, . . . such that [they] could obtain stand-by letters of credit ("SLOC") for the victims upon the victims' prepayment of upfront 'advance fees.'" (Augusto Decl., Ex. C, Letter from Office of the Florida Attorney General to Luiz Augusto de Quieroz (July 17, 2006) at 2.) Dorchester does not refute this evidence; to the contrary, it admits that it "was aware of" the matters prior to filing the instant complaint, and that they "gave plaintiff insight into what to expect in this action." (Pl.'s Mem. at 10.) Dorchester's argument that these documents have no bearing on the issue of personal jurisdiction is incorrect; although the evidence submitted in other proceedings does not affirmatively establish that BRJ was not involved in this particular transaction, it is circumstantial evidence that this transaction is one in a series of frauds perpetrated by individuals masquerading as BRJ officials.

It bears mention that much of the substantial evidence of fraud presented by BRJ was evident at the outset of the transaction, such that Dorchester's reliance on representations made by persons posing as BRJ officials may have been unreasonable. Dorchester admits that it was concerned about BRJ's capitalization and assets, and that its own accountant advised it not to proceed with what he called an "unwise" transaction. That BRJ, a bank with no history of business in the United States and an asset base of $100 million, would issue a letter of credit for

14

$250 million—or even the $100 million originally contracted for—should at the very least have prompted Dorchester to further investigate the bona fides of the individuals with whom it was dealing.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS with prejudice BRJ's motion to dismiss pursuant to Rule 12(b)(2). Because the Court dismisses Dorchester's claims on Rule 12(b)(2) grounds, it need not address BRJ's motion to dismiss pursuant to Rules 12(b)(1) and (6). The Clerk of Court is directed to close this case. Any pending motions are moot.

SO ORDERED.

Dated: New York, New York
January 24, 2012

_Kimba M. Wood_
Kimba M. Wood
United States District Judge

15