UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

DORCHESTER FINANCIAL HOLDINGS CORP.
f/k/a DORCHESTER FINANCIAL SECURITIES,
INC.,

                              Plaintiff,                        11-CV-1529 (KMW)
                                                                    **OPINION & ORDER**

       -against-

BANCO BRJ S.A.,

                              Defendant.
---------------------------------------------------------------X

KIMBA M. WOOD, District Judge:

      In his September 12, 2014 Memorandum and Order (the "Memorandum and Order" or "M & O"), Magistrate Judge Fox made two discovery-related determinations to which Plaintiff Dorchester Financial Holdings Corporation ("Dorchester") has objected. First, Judge Fox held that Dorchester committed spoliation when it destroyed a computer that contained documents relevant to Defendant Banco BRJ S.A.'s ("BRJ") defense. (*See* M & O at 13–16 [ECF No. 158]). To sanction Dorchester's spoliation, Judge Fox precluded evidence derived solely from the computer and ordered Dorchester and its former counsel to pay BRJ's attorney's fees in connection with the spoliation dispute. (*See id.* at 17–19). Second, Judge Fox held that Dorchester is obligated, under the parties' discovery stipulation, to produce Robert Cox for a live deposition in the United Kingdom. (*See id.* at 19–20). Dorchester contends that both determinations were clearly erroneous or contrary to law, and that Judge Fox cannot impose the preclusion order in any event because it is tantamount to dismissal. (*See* Dorchester's Objection [ECF No. 165]).

1

After reviewing the spoliation dispute *de novo*, the Court agrees with Judge Fox that Dorchester committed spoliation, but imposes a mandatory adverse inference instead of the preclusion order. And after review for clear error, the Court AFFIRMS Judge Fox's order compelling the Cox deposition.

**I.     Standard of Review**

Several months ago, the Court referred general pretrial proceedings, including discovery and non-dispositive motions, to Judge Fox. (*See* May 16, 2014 Order of Reference [ECF No. 73]). Pursuant to that referral, Judge Fox has the authority to impose sanctions for spoliation — including the preclusion of evidence — as long as those sanctions are non-dispositive. *See, e.g.*, *UBS Int'l Inc. v. Itete Brasil Instalacoes Telefonicas Ltd.*, No. 09-CV-10004, 2011 WL 1453797, at *1 n.2 (S.D.N.Y. Apr. 11, 2011) (Francis, M.J.) (explaining that a magistrate judge lacks authority to dismiss a case as a sanction for spoliation, but "has the authority to issue less severe sanctions, including preclusion orders, in the course of overseeing discovery"); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 247–48 & n.1 (S.D.N.Y. 2010) (Marrero, J.) (holding that a magistrate judge had authority to preclude evidence as a sanction for spoliation). The Court must uphold Judge Fox's non-dispositive spoliation sanctions unless they are clearly erroneous or contrary to law. *See* Fed. R. Civ. P. 72(a).

Judge Fox can also recommend dispositive spoliation sanctions for the Court's consideration, although he cannot impose such sanctions unilaterally. *See* Fed. R. Civ. P. 72(b); *see also Kiobel v. Millson*, 592 F.3d 78, 101 (2d Cir. 2010) (Leval, J., concurring) (explaining that a magistrate judge has authority to impose only those discovery sanctions that are non-dispositive). The Court can adopt a recommended dispositive sanction only after *de novo* review. *See* Fed. R. Civ. P. 72(b).

The parties dispute whether the preclusion of evidence derived from the computer is a dispositive sanction. Dorchester argues that preclusion is dispositive of its claims because documents derived from the computer constitute its "*prima facie* case," and barring admission of those documents would be tantamount to dismissal. (Dorchester's Objection at 7). BRJ disagrees, emphasizing that Dorchester would still possess admissible evidence not derived from the computer. (*See* BRJ's Response at 3 [ECF No. 167]). Nevertheless, BRJ concedes that preclusion may critically weaken Dorchester's claims, and so asks the Court — for the sake of "prudence" — to review at least a portion of Judge Fox's preclusion order *de novo*. (*Id.* at 3–4).

In an abundance of caution, the Court will treat Judge Fox's decision regarding spoliation as a recommendation and review it *de novo*. *Cf.* 14 James Wm. Moore et al., *Moore's Federal Practice* § 72.08[1] (3d ed. 2014) ("If a magistrate judge erroneously enters an order purporting to determine a dispositive matter, a district judge reviewing the order may ignore the form of the decision and treat it as a recommendation."). But the Court reviews Judge Fox's decision to compel Cox's live deposition only for clear error.

**II.   Spoliation**

   A.   Procedural Background

Dorchester first filed suit against BRJ, a Brazilian bank, in 2002. Dorchester claimed that BRJ had committed breach of contract and fraud by failing to honor a $250 million letter of credit it issued to Dorchester on October 16, 2001. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, No. 02–CV–7504 (S.D.N.Y. 2002) (*Dorchester I*). BRJ failed to appear, and the Court granted default judgment for Dorchester. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.,* No. 11–CV–1529, 2012 WL 231567, at *3 (S.D.N.Y. Jan. 24, 2012). That judgment, however, proved unenforceable in Brazilian court because Dorchester had not served BRJ using letters

rogatory.  Dorchester then moved to vacate the default judgment without prejudice so that it could pursue, using letters rogatory, a new judgment that would be enforceable in Brazil.  The Court vacated the default judgment on February 24, 2011.  *See* Order, *Dorchester I* [ECF No. 73].

Dorchester refiled on March 7, 2011, again claiming that BRJ had committed breach of contract and fraud by failing to honor the $250 million letter of credit.  (*See* Complaint [ECF No. 1]).  This time, BRJ appeared to defend the action.  On August 10, 2011, BRJ moved to dismiss the Complaint on several grounds, including lack of personal jurisdiction.  (*See* BRJ's Mem. to Dismiss the Compl. at 10–19 [ECF No. 11]).  BRJ argued that it had insufficient contacts with New York because it had never transacted business with Dorchester; the letter of credit, according to BRJ, was counterfeit.  (*See id.* at 14–18).

On August 19, 2011, Dorchester filed its brief opposing BRJ's motion to dismiss (the "Opposition Brief").  The brief argued that the letter of credit was authentic and made several new allegations about its provenance.  (*See* Opp. Brief [ECF No. 14]).  In particular, Dorchester claimed, for the first time, that Dorchester and BRJ had executed an October 3, 2001 contract obligating BRJ to provide the letter of credit.  (*See id.* at 3–5).  According to Dorchester, the contract included a choice of law provision that required BRJ to adjudicate all disputes related to the letter of credit in New York, which provided an additional ground for personal jurisdiction.  (*See id.* at 4).  Dorchester attached a copy of the purported contract to the Opposition Brief.  (*See id.* Ex. G).  In reply, BRJ argued that the contract was also counterfeit, and suggested that its "sudden emergence" after BRJ's challenge to personal jurisdiction was "extremely suspicious."  (BRJ's Reply Brief at 3 [ECF No. 20]).

On August 31, 2011, Dorchester filed its First Amended Complaint ("FAC"), which contained new allegations that BRJ had breached the purported October 3, 2001 contract. (*See* FAC [ECF No. 24]). BRJ again moved to dismiss for lack of personal jurisdiction, among other reasons, reiterating its claims that the contract, the letter of credit, and related documents were counterfeit. (*See* BRJ's Mem. to Dismiss the FAC [ECF No. 28]). On January 24, 2012, the Court dismissed the FAC for lack of personal jurisdiction. A month later, Dorchester filed notice of its appeal, which was ultimately successful. (*See* Feb. 23, 2014 Notice of Appeal [ECF No. 36]).

B.  Dorchester's Use and Destruction of the Computer

Before Dorchester first filed suit against BRJ in 2002, its officer and attorney, T.J. Morrow, gathered all documents — both hard copy and electronic — in Dorchester's possession that related to the dispute. (*See* Apr. 16, 2014 Dep. of T.J. Morrow ("Morrow Dep.") at 56:3–22). Morrow initially saved all of the electronic documents, which included emails and the purported October 3, 2001 contract, on the hard drive of his personal computer. (*See id.* at 59:14–60:6, 265:13–17). Morrow believes that at some point between 2002 and 2012, he transferred those electronic documents to the hard drive of a new personal computer he acquired. (*See id.* at 90:6–92:25).

In August 2011 — the month in which Dorchester filed both the Opposition Brief and the FAC — Morrow printed copies of several electronic documents on which Dorchester's filings relied, including the purported contract. (*See id.* at 262:22–263:18, 265:9–267:16). In March 2012, in connection with Dorchester's pending appeal of the FAC's dismissal, Morrow printed copies of other electronic documents "that [he] thought . . . would be beneficial to Dorchester."

(*Id.* at 88:3–25). The computer contained additional documents related to Dorchester's dispute with BRJ that Morrow chose not to print in 2011 or 2012. (*See id.* at 62:3–8; 62:25–63:6).

According to Morrow, his computer "crashed" several days after he printed documents related to Dorchester's appeal in March 2012. (*Id.* at 89:7–90:20). Morrow asked his brother-in-law Charles Brown, who lacked any formal computer training, to examine the computer. (*See id.* at 93:11–94:2; 95:3–5). Brown "advised . . . that it was basically gone and that [Morrow] needed to get a new machine," and that "[i]f there was anything [Morrow] could take off of it, [he] should." (*Id.* at 94:3–7). Without consulting a computer specialist to see if the hard drive could be salvaged, or informing BRJ or the Court of the computer crash, Morrow destroyed the computer. (*See id.* at 94:8–25; 102:22–103:3). Because Dorchester had not created an electronic backup of the hard drive, all metadata and all documents not printed previously were lost entirely. (*See id.* at 61:21–62:8). Dorchester did not mention the loss of documents to BRJ or the Court until April 2014, more than two years later, in response to BRJ's request for discovery. (*See* Dorchester's Apr. 10, 2014 Discovery Response [ECF No. 81 Ex. 8]; Dorchester's Apr. 14, 2014 Discovery Addendum [ECF No. 81 Ex. 10]; Morrow Dep. at 102:22–103:3).

C. Judge Fox's Recommendation

Judge Fox concluded that Dorchester's disposal of Morrow's computer constituted spoliation of evidence meriting sanctions. As the Memorandum and Order explains, such spoliation has three elements:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence was] destroyed with a "culpable state of mind"[;] and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

6

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) (Scheindlin, J.) (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 107–09 (2d Cir. 2001); (*see also* M & O at 10). In this context, a "culpable state of mind" requires at least negligence. *Id.* And where a party destroys evidence "in bad faith or in a grossly negligent manner," the relevance of the destroyed evidence may be presumed. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010) (Scheindlin, J.), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012).

Judge Fox concluded that Dorchester's destruction of the hard drive satisfied all three elements of spoliation meriting sanctions. First, he held that Dorchester had an obligation in March 2012 to preserve electronic documents stored on Morrow's computer. (*See* M & O at 13–15). Second, Judge Fox held that Dorchester breached that obligation with a culpable state of mind — bad faith — by destroying the computer without first consulting with a computer specialist or alerting the Court. (*See id.*). Finally, Judge Fox found that the hard drive contained documents that would have been relevant and favorable to BRJ's defense. (*See id.* at 15–16).

The Memorandum and Order recommends two sanctions for Dorchester's spoliation: precluding the use of documents printed from the computer before its destruction, and ordering Dorchester and Morrow to pay BRJ's attorney's fees in connection with the spoliation dispute. (*See id.* at 17–19). As Judge Fox explained, spoliation sanctions should accomplish three goals: (1) "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party," *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); (2) "place the risk of an erroneous judgment on the party who wrongfully created the risk," *id.*; and (3) "deter parties from engaging in spoliation," *id.* Judge

7

Fox concluded that preclusion, along with a monetary sanction, was necessary to accomplish those goals. (*See* M & O at 17–18).

### D. Discussion

Dorchester asserts, in conclusory fashion, that Judge Fox erred in holding that its destruction of Morrow's computer satisfied any of the elements of spoliation. (*See* Dorchester's Objection at 7). After *de novo* review, the Court agrees with Judge Fox that Dorchester spoliated relevant electronic information stored on the computer. Instead of precluding evidence derived from the device, however, the Court imposes a mandatory adverse inference (along with liability for BRJ's attorney's fees and costs) to sanction Dorchester's misconduct.

#### i. Dorchester's Duty to Preserve

When Morrow's computer allegedly crashed in March 2012, Dorchester was under a duty to preserve the documents and metadata stored on its hard drive that related to this action. Dorchester was actively litigating its appeal of the FAC's dismissal at the time, and it had control over Morrow's computer, the sole repository of its electronic evidence.

Dorchester's duty to preserve did not end when the computer allegedly crashed. The fact that a personal computer stops functioning is by no means a death knell for the data it contains. By March 2012, it was widely understood that computer specialists can often recover data from a failed computer, even when the hard drive has malfunctioned. *See, e.g.*, Eric A. Taub, *E.R. for Hard Drives*, N.Y. Times, July 14, 2005, *available at* http://www.nytimes.com/2005/07/14/technology/circuits/14drive.html (reporting, in 2005, that a data recovery company could salvage "up to 90 percent of the data . . . from 85 to 90 percent of drives"). For that reason, courts in recent years have routinely ordered forensic examinations of failed hard drives during discovery. *See, e.g.*, *Aliki Foods, LLC v. Otter Valley Foods, Inc.*, 726 F. Supp. 2d 159, 173 (D. Conn.

2010) (noting that the court ordered a forensic examination of a hard drive "in an attempt to mitigate the damage caused by the hard drive's alleged failure"); *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 124 (S.D.N.Y. 2008) (Francis, M.J.) (permitting a forensic examination of a laptop to determine whether lost information subject to discovery could be recovered); *see also Wynmoor Cmty. Council, Inc. v. QBE Ins. Corp.*, 280 F.R.D. 681, 687 (S.D. Fla. 2012) (compelling a forensic examination to determine if electronic files that a party described as "unrecoverable" could in fact be retrieved).

Accordingly, the Court finds that Dorchester had a duty to preserve Morrow's computer after its alleged crash, and to make reasonable efforts to recover the data it contained.[1]  Although it appears that no court within the Second Circuit has squarely addressed the duty to preserve a failed computer or hard drive, the Court's approach is in line with decisions from at least two other federal jurisdictions.  *See Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 511–12 (6th Cir. 2014) (noting that "failed hard drives . . . would have been subject to [the defendant's] duty to preserve evidence"); *Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374, 378 (D.D.C. 2013) (noting that a defendant's failure to "make any serious effort to recover the data" on a crashed computer that contained relevant emails "constitutes a conscious disregard of [the defendant's] preservation obligations" (internal quotation marks and citation omitted)).

    ii. <u>Culpable Destruction</u>

Dorchester violated its duty to preserve the data on Morrow's computer by destroying the device after its alleged crash, without making any reasonable effort to retrieve the information it

---

[1] If Dorchester had concerns about the cost of hiring a computer specialist, it should have consulted with BRJ and the Court about arranging a payment plan.  The Court could have accommodated Dorchester's financial limitations when arranging a forensic examination.  *Cf. Aliki*, 726 F. Supp. 2d at 173 (noting that the court "ordered [the plaintiff] to pay the first $10,000 of the cost of [a] forensic examination," but "offered [the plaintiff] the opportunity to obtain relief from this financial obligation by demonstrating that it could not afford to pay for the forensic examination, which its counsel claimed was the case").

contained. Dorchester's first response to the crash was to consult Charles Brown, a relative of Morrow's with no computer training. It is clear that Brown did not attempt to retrieve data from the computer; rather, he advised Morrow that "[i]f there was anything [Morrow] could take off of it, [he] should." (Morrow Dep. at 94:6–7). Not surprisingly, Morrow — who describes himself as "not much of a computer person" — was "unsuccessful" in retrieving any data on his own. (*Id.* at 94:7, 19–20). More surprisingly, however, Dorchester made no effort to consult with any type of computer specialist after Brown's visit. (*See id.* at 94:21–25). Instead, Dorchester inexplicably chose to destroy the computer, foreclosing any future attempt — including by BRJ or the Court — to retrieve data. In light of Dorchester's duty to preserve Morrow's computer, its disposal of the device was, at a minimum, grossly negligent.

Because Dorchester foreclosed any professional examination of the computer, the degree to which data could have been recovered after the alleged crash — and, consequently, the scope of electronic information that was destroyed by Dorchester rather than the alleged crash — is necessarily somewhat indeterminate. It appears that no court within the Second Circuit has squarely addressed how that particular type of indeterminacy affects spoliation analysis. On the facts presented here, the Court concludes that Dorchester's untimely destruction of the computer qualifies, under the spoliation doctrine, as destruction of all data stored on the machine before the alleged crash. The Court reaches that conclusion for several reasons.

First, in light of the efficacy of forensic examination and data retrieval, at least some of the data on Morrow's computer likely could have been recovered by a computer specialist. Dorchester has not alleged otherwise. It asserts merely that Morrow, who lacked any relevant technological expertise, was unable to access the computer's data.

10

Second, the spoliation doctrine is designed to equitably resolve uncertainties about the nature and scope of lost evidence. Courts almost always possess imperfect information about what, precisely, a party's spoliation has destroyed. That creates a risk that the Court will err in weighing — and correcting — the effect of the spoliation on the opposing party. The spoliation doctrine functions to "place the risk" of such error "on the party who wrongfully created the risk." *West*, 167 F.3d at 779. Here, Dorchester created a risk of error concerning the scope of evidence that remained intact on Morrow's computer at the moment of its disposal. In keeping with the principles of the spoliation doctrine, the Court places that risk on Dorchester by concluding that all data stored on the computer before the alleged crash remained viable afterward.

Third, declining to extend the spoliation doctrine to reach Dorchester's misconduct might invite similar misconduct in the future, threatening the efficacy of the doctrine. Dorchester has gained a pronounced tactical advantage through its destruction of Morrow's computer: the documents "beneficial" to its claim remain, while all other files (and any metadata associated with the surviving documents) have vanished. If Dorchester's conduct does not qualify as spoliation of the data on Morrow's computer, then future parties may neglect to attempt data recovery from a failed drive — or even intentionally destroy a functioning drive — in the hope of biasing the universe of available evidence while escaping significant discovery sanctions.

Finally, although courts within the Second Circuit have not considered this precise application of the spoliation doctrine, the Court's reasoning is in line with at least one decision from another federal jurisdiction. *See Beck*, 289 F.R.D. at 378 (holding that a party's failure to "make any serious effort to recover the data" on a crashed computer that contained relevant

emails "constitutes culpable conduct supporting [an adverse] inference" under the spoliation doctrine).

### iii. Relevance of the Data

Because Dorchester's destruction of Morrow's computer and the data it contained was at least grossly negligent, the Court assumes that the lost data was relevant to BRJ's defense. *See Pension Comm.*, 685 F. Supp. 2d at 467 ("Relevance and prejudice may be presumed when the spoliating party acted in bad faith or in a grossly negligent manner."). Dorchester has not rebutted that assumption; rather, Morrow's testimony corroborates it. By his own admission, the computer contained discoverable electronic documents, including emails, that he chose not to print because they were not "beneficial" to Dorchester. (*See* Morrow Dep. at 62:3–8, 62:25–63:6, 88:3–25). The Court finds that those non-beneficial documents were relevant to BRJ's defense. The computer likely also contained metadata for documents Morrow printed, including the purported October 3, 2001 contract. Those metadata — or the fact of their absence — also would have been relevant to BRJ's defense, particularly its contention that the contract was a fabrication. *See Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP*, No. 03-CV-5560, 2008 WL 5423316, at *6 (S.D.N.Y. Dec. 31, 2008) (Pitman, M.J.) ("In general, metadata is relevant when the process by which a document was created is in issue or there are questions concerning a document's authenticity; metadata may reveal when a document was created, how many times it was edited, when it was edited and the nature of the edits.").

The Court thus concludes that Dorchester committed spoliation meriting sanctions when it destroyed Morrow's computer.

iv. <u>Sanctions</u>

"The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) (Scheindlin, J.) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)). As Judge Fox explained, the sanctions imposed for spoliation should accomplish three goals: correcting prejudice suffered by the non-spoliating party, placing the risk of an erroneous judgment on the spoliating party, and deterring future spoliation. *See West*, 167 F.3d at 779. "It is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy. The choices include — from least harsh to most harsh — further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal (terminating sanctions)." *Pension Comm.*, 685 F. Supp. 2d at 469 (citations omitted).

Dorchester's spoliation has prejudiced BRJ in a severe way. Morrow's hard drive was the sole repository for the entire universe of electronic evidence in Dorchester's possession. It included an unknown numbers of lost documents, including emails, and likely also contained metadata for surviving documents like the purported October 3, 2001 contract. (*See* Morrow Dep. at 57:5–60:6, 265:13–17). As a result of Dorchester's spoliation, that universe of electronic evidence has contracted dramatically and now includes only the documents most favorable to Dorchester's claims (stripped of any available metadata). The prejudice to BRJ is thus extreme in two respects: the potential scope of the evidence lost, and the pro-spoliator bias of the documents that remain.

That prejudice can be corrected only by a substantial sanction. The preclusion of evidence recommended by Judge Fox is a compelling option in many respects. But it would also

be a particularly harsh measure given the extent of Dorchester's reliance on documents derived solely from Morrow's computer, including the purported October 3, 2001 contract.  Of course, Dorchester's reliance on those documents cuts both ways.  The centrality of the purported contract to Dorchester's claims, for example, makes the spoliation of any metadata associated with the contract more prejudicial to BRJ, which in turn makes preclusion more appealing.  After balancing considerations for both parties, however, the Court believes that a different (but still severe) evidentiary sanction is better suited to this case:  a mandatory adverse inference.  The factfinder will be compelled to infer that Dorchester destroyed electronic evidence, including emails and metadata, favorable to BRJ's claim that it did not participate in the transactions at issue in this action.

To fully correct the prejudice to BRJ from Dorchester's spoliation, the Court also orders Dorchester and Morrow to pay BRJ's reasonable attorney's fees and costs in connection with the spoliation dispute.  *Cf. Taylor v. City of New York*, 293 F.R.D. 601, 616 (S.D.N.Y. 2013) (Patterson, J.) ("The Court's imposition of spoliation sanctions warrants the award of reasonable attorney's fees and costs to Plaintiff for his efforts with respect to this motion.  Such a monetary award is appropriate because it serves the remedial purpose of making Plaintiff whole for the costs he has incurred as a result of Defendants' spoliation.").

### III.   Cox's Deposition

Judge Fox also found that Dorchester is obligated, under the discovery plan in this action, to produce Robert Cox for a live deposition in the United Kingdom.  (*See* M & O at 19–20). Judge Fox rejected Dorchester's contention that BRJ waived its right to depose Cox by declining the witness's offer of a deposition by email, and ordered Dorchester to produce Cox by September 26, 2014.  (*See id.*).  Dorchester has objected to that order, reiterating its claim that

BRJ waived its right to the deposition. (*See* Dorchester Objection at 5). After review, the Court holds that Judge Fox's order was not clearly erroneous or contrary to law.

### IV. Conclusion

For the foregoing reasons, the Court holds that Dorchester spoliated evidence stored on Morrow's computer and imposes two sanctions, an adverse inference and the payment of BRJ's attorney's fees and costs. The Court also AFFIRMS Judge Fox's order compelling Dorchester to produce Robert Cox for a live deposition. Dorchester must produce Cox by January 14, 2015.

On September 19, 2014, BRJ submitted evidence of the reasonable attorney's fees it had previously incurred while litigating the spoliation dispute. (*See* BRJ's Mem. for Attorney's Fees [ECF No. 162]). The Court orders BRJ to submit revised evidence of its reasonable attorney's fees and costs by December 22, 2014. Dorchester may submit a challenge to BRJ's calculation by December 31, 2014, and BRJ may reply by January 9, 2015.

SO ORDERED.

Dated: New York, New York
December 15, 2014

/s/
Kimba M. Wood
United States District Judge