UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

DORCHESTER FINANCIAL HOLDINGS CORP.
f/k/a DORCHESTER FINANCIAL SECURITIES,
INC.,

                Plaintiff,                                  11-CV-1529 (KMW)
                                                                        **OPINION & ORDER**

       -against-

BANCO BRJ, S.A.,

                Defendant.
---------------------------------------------------------------X
WOOD, United States District Judge:

        Plaintiff Dorchester Financial Holdings Corp. ("Dorchester") brings this diversity action against Defendant Banco BRJ, S.A. ("BRJ") for breach of contract in connection with a letter of credit that Dorchester alleges was extended to it by Defendant. Defendant denies issuing the letter of credit and argues that the document is a forgery. Defendant has now moved for summary judgment, pursuant to Federal Rule of Civil Procedure 56.

        For the reasons stated below, the Court GRANTS Defendant's motion.

**I.    BACKGROUND**

*A. Factual Background*

        The factual background of this case has been explained at length in previous decisions. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, No. 11-CV-1529, 2012 WL 231567, at *1-3 (S.D.N.Y. Jan. 24, 2012) (Wood, J.); *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, No. 11-CV-1529, 2014 WL 684831, at *1-2 (S.D.N.Y. Feb. 21, 2014) (Wood, J.). What follows is a brief summary.

1

Plaintiff alleges that, in October of 2001, it entered into an agreement with Defendant and a third party, African Capital Partners ("ACP"), in which Defendant agreed to issue a $100 million letter of credit to Plaintiff (the "Alleged Letter of Credit Issuance Agreement"). (Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶ 4, [Doc. No. 227-1]). According to Plaintiff, Defendant subsequently issued the letter of credit, but for $250 million rather than the $100 million specified in the Alleged Letter of Credit Issuance Agreement. *See id.* ¶ 7. Plaintiff claims that it received a message from Defendant confirming the issuance of the letter of credit and notifying Plaintiff that the letter was being held on reserve for Plaintiff's use. *Id.* ¶ 6. Plaintiff also claims that it initially paid a $500,000 fee for the letter of credit, and that Defendant later demanded an additional $250,000, of which Plaintiff claims it paid $100,000. *Id.* ¶¶ 5, 8. According to Plaintiff, Defendant refused to honor the letter of credit, despite these purported payments, and eventually told Plaintiff, in July 2002, that it had cancelled the letter of credit. (Pl.'s Rule 56.1 Response ¶ 203, [Doc. No. 233]).

Meanwhile, Defendant denies that it ever communicated or conducted business with either ACP or Plaintiff, and denies that it ever entered into the Alleged Letter of Credit Issuance Agreement or issued the alleged letter of credit. *See* (Def.'s 56.1 ¶¶ 20-21)

B. *Relevant Procedural History*

On March 7, 2011, Plaintiff filed this action against Defendant alleging breach of contract under New York state law.[1] (Compl. [Doc. No. 1]). On January 24, 2012, the Court

---

[1] Dorchester originally sued BRJ over the failed letter of credit transaction in 2002, alleging breach of contract and fraud under New York state law. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 02-CV-7504 (S.D.N.Y. 2002) (Wood, J.). BRJ failed to appear, and Dorchester obtained a default judgment. *See* Default Judgment, 02-CV-7504 (S.D.N.Y. Nov. 11, 2002) [Doc. No. 10]. Following an inquest, a final judgment was entered against BRJ in the amount of $112,279,452.05. *See* Order, 02-CV-7504 (S.D.N.Y. Nov. 25, 2003) [Doc. No. 24]. In 2010, however, Dorchester moved to vacate the judgment it had obtained. *See* Pet. To Vacate, 02-CV-7504 (S.D.N.Y. Dec. 2, 2010) [Doc. No. 70]. Dorchester had learned that the judgment was unenforceable against BRJ in Brazil because Dorchester had not served process by letters rogatory as required by Brazilian law. Dorchester explained to the Court that, in order to recover from BRJ, it instead needed to serve BRJ by letters rogatory in a new

granted Defendant's motion to dismiss for lack of personal jurisdiction, finding that Defendant had "offered an overwhelming amount of 'direct, highly specific testimonial evidence'" that it "was never involved in the events giving rise to this cause of action" and that the documents upon which Plaintiff relied were forgeries, "none of which [Plaintiff] ha[d] sufficiently refuted." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, No. 11-CV-1529, 2012 WL 231567, at *5 (S.D.N.Y. Jan. 24, 2012) (Wood, J.) (quoting *Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 420 (S.D.N.Y. 2006) (Chin, J.)).

On appeal, the Second Circuit vacated and remanded, holding that this Court should not have resolved the parties' factual dispute over the authenticity of Plaintiff's evidence in support of personal jurisdiction absent an evidentiary hearing. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013). The Second Circuit held that (1) at the motion to dismiss stage, "a prima facie showing of personal jurisdiction" is sufficient, unless or until an evidentiary hearing is held, and (2) Plaintiff had made the necessary prima facie showing. *Id.* at 85-86. However, the Second Circuit noted that "there is plainly reason to question the authenticity of the October 3, 2001 letter agreement, as BRJ's evidence submitted to the district court tends to show that the agreement and the other documents upon which Dorchester relied were forgeries." *Id.* at 86.

On remand, this Court considered and denied Defendant's outstanding motions to dismiss the Complaint on grounds other than personal jurisdiction. *See Dorchester Fin. Sec., Inc. v.*

---

action. Aff. in Support of Pet. To Vacate ¶ 10, 02-CV-7504 (S.D.N.Y. Dec. 2, 2010) [Doc. No. 71]. On February 23, 2011, this Court granted Dorchester's motion to vacate the default judgment and permitted Dorchester to file a new action pursuant to N.Y. C.P.L.R. § 205, the statute of limitations tolling provision. *See* Order, 02-CV-7504 (S.D.N.Y. Feb. 23, 2011) [Doc. No. 73].

   Defendant now argues that Dorchester is not entitled to claim the benefit of Section 205 because Dorchester failed to obtain personal jurisdiction over BRJ in the prior action. *See* (Mem. of Law in Supp. Mot. for Summ. J., 1 [Doc. No. 231]). Because the Court resolves BRJ's motion for summary judgment on other grounds, it does not need to decide whether or not tolling under Section 205 was proper.

3

*Banco BRJ, S.A.*, No. 11-CV-1159, 2014 WL 684831 (S.D.N.Y. Feb. 21, 2014) (Wood, J.). The parties completed discovery, and, in July of 2015, Defendant moved for summary judgment on multiple grounds. (Mem. of Law in Supp. Mot. for Summ. J., [Doc. No. 231]); (Second Mem. of Law in Supp. Mot. for Summ. J., [Doc. No. 251]).

## II.     LEGAL STANDARD

Summary judgment is appropriate where the record establishes that there is no "genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, a court must "construe the evidence in the light most favorable" to the non-moving party and "draw all reasonable inferences" in the non-moving party's favor.[2] *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010) (citing *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). The moving party carries the burden of showing there is no genuine dispute of material fact. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).

A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Supreme Court and the Second Circuit have made clear that the existence of a mere "scintilla of evidence in support of the plaintiff's position" is not enough to defeat a properly-supported motion for summary judgment. *Anderson*, 477 U.S. at 252; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Lyons v.*

---

[2] In its December 15, 2014 Opinion & Order, this Court held that "[t]he factfinder will be compelled to infer that Dorchester destroyed electronic evidence, including emails and metadata, favorable to BRJ." *Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014) (Wood, J.). However, for the purposes of deciding this summary judgment motion, the Court has not applied any adverse inference, but instead has followed the general summary judgment standard and construed the facts in the light most favorable to the non-moving party.

*Lancer Ins. Co.*, 681 F.3d 50, 56-57 (2d Cir. 2012) (summary judgment appropriate where "the opposing party's proffered evidence is merely colorable or is not significantly probative" (internal quotation marks omitted)); *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) ("The motion [for summary judgment] will not be defeated merely on the basis of conjecture or surmise." (internal quotation marks omitted)).

To demonstrate the existence of a genuine issue of material fact, "[t]he opposing party must come forward with affidavits, depositions, or other sworn evidence as permitted by Federal Rule of Civil Procedure 56, setting forth specific facts." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). This evidence must be significant and sufficiently probative for a reasonable fact-finder to decide in favor of the non-moving party on *each* element of his or her claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). The non-moving party "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that [the] affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518 (internal citations and quotation marks omitted).

### III. DISCUSSION

Defendant argues that the documents relied upon by Dorchester are forgeries, and that Dorchester has failed to show a genuine dispute of fact on this issue. The Court agrees.

#### A. *A Valid Contract Is a Necessary Element of Each of Dorchester's Claims*

Each cause of action asserted by Plaintiff in its Complaint is predicated upon the existence of a valid letter of credit agreement with Defendant. *See* (Second Amended Compl.

("SAC") ¶¶ 25-35 [Doc. No. 67]). However, "[u]nder [New York] State law and general contract law, a forged signature renders a contract void *ab initio*. Because there can be no meeting of the minds of the parties when a forgery has been perpetrated, no contract [can] exist[]." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 370 (2d Cir. 2003) (quoting *Orlosky v. Empire Sec. Sys.*, 657 N.Y.S.2d 840, 842 (App. Div. 1997)); *see also Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, No. 03-CV-0015, 2004 WL 1406076, at *6 (S.D.N.Y. June 23, 2004) (Sweet, J.).

B. *There Is No Genuine Dispute of Fact as to Whether the Documents Relied upon by Dorchester Are Forgeries*

Defendant has proffered significant evidence that the Alleged Letter of Credit Issuance Agreement and the alleged letter of credit itself are forgeries.[3]

1. Defendant's Evidence

First, the sworn declarations of Augusto de Queiroz and Claudio de Queiroz deny the existence of any relationship or communication between Defendant and either Plaintiff or ACP. Both Augusto and Claudio de Queiroz state, under penalty of perjury, that Defendant has no

---

[3] BRJ relies primarily on (1) declarations submitted by Luiz Augusto de Queiroz ("Augusto de Queiroz"), who has been a member of BRJ's Board of Directors since 1984, (Aug. 5, 2011 Decl. of Augusto de Queiroz, Rivkin Decl. Ex. D ("Aug. 5 Augusto Decl.") [Doc. No. 250-4, 250-5]), (Aug. 25, 2011 Decl. of Augusto de Queiroz, Rivkin Decl. Ex. E ("Aug. 25 Augusto Decl.") [Doc. No. 250-6]), (July 29, 2014 Decl. of Augusto de Queiroz, Rivkin Decl. Ex. G ("July 29 Augusto Decl.") [Doc. No. 250-8]); (2) a declaration submitted by his brother, Luiz Claudio de Queiroz ("Claudio de Queiroz"), also a member of BRJ's Board of Directors, (Aug. 25, 2011 Decl. of Claudio de Queiroz, Rivkin Decl. Ex. F ("Claudio Decl.") [Doc. No. 250-7]); and (3) an export report written by Professor James E. Byrne regarding the standard practices of financial institutions that issue letters of credit, (Expert Report of Professor James E. Byrne, Rivkin Decl. Ex. C ("Byrne Report") [Doc. No. 250-3]).

Dorchester argues that the expert report of Professor Byrne may not be relied upon by the Court in deciding the motion for summary judgment because Professor Byrne "lacks personal knowledge of the facts of this case." (Opp'n, 3). However, "[i]n considering a summary judgment motion 'the district court may rely on any material that would be admissible or usable at trial.'" *BanxCorp v. Costco Wholesale Corp.*, 978 F. Supp. 2d 280, 321 (S.D.N.Y. 2013) (Karas, J.) (quoting *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)). Unlike a fact witness, an expert witness need not have personal knowledge of the facts of the case, so long as his or her expert opinion is based on "sufficient facts or data" and is the "product of reliable principles and methods." Fed. R. Evid. 702. Therefore, the Court may consider the report of Professor Byrne in deciding the motion for summary judgment.

record of any relationship with either Plaintiff or ACP, and that they have never heard of either entity. (Aug. 5 Augusto Decl. ¶ 10); (Claudio Decl. ¶ 6). Both also declare that Defendant has never had a client or customer named ACP, and has never held any assets owned by ACP. *Id.*

### a. *The Alleged Letter of Credit Issuance Agreement*

BRJ asserts that the Alleged Letter of Credit Issuance Agreement between Dorchester, BRJ, and ACP is fraudulent. Augusto de Queiroz states that BRJ has no knowledge of the Alleged Letter of Credit Issuance Agreement, (July 29 Augusto Decl. ¶ 8); that no one named Luis Alcazar was an employee or an officer of BRJ at the time of the alleged agreement, *id.* ¶ 15(c); and that BRJ has been the victim of other similar frauds involving a person using the name "Luis Alcazar." *Id.*; (Aug. 5 Augusto Decl. ¶¶ 17-28).

The terms of the Alleged Letter of Credit Issuance Agreement also support the conclusion that the document is fraudulent. BRJ's expert, Professor Byrne, states that the terms of the Alleged Letter of Credit Agreement are not consistent with legitimate letter of credit transactions. *See* (Def.'s 56.1 ¶¶ 52-58). In particular, Professor Byrne notes that the agreement fails to provide any benefit or consideration to BRJ in exchange for its promise to issue a letter of credit worth $100 million. (Byrne Report ¶ 44(a)). Professor Byrne also notes the absence of (1) any provision requiring ACP to reimburse BRJ, or (2) any provision requiring Dorchester to reimburse ACP, in the event that Dorchester were to draw on the letter of credit, as would ordinarily be expected in an agreement of this kind. *Id.* Without these provisions, there is no "plausible commercial reason" for either ACP or BRJ to enter into this transaction, *id.* ¶ 43, because neither party stands to benefit in any way from extending a $100 million letter of credit to Dorchester.

The absence of a plausible commercial reason for BRJ to enter the transaction is corroborated by the size of BRJ's asset base. Augusto de Queiroz states that BRJ's "total portfolio of non-mortgage instruments is approximately $100 million." (Aug. 5 Augusto Decl. ¶ 3). Given this portfolio, it would make no commercial sense for BRJ to enter into a letter of credit transaction with a value approximately equal to its *entire* asset base.

> b. *The Letter of Credit*

BRJ also proffers significant evidence that the alleged letter of credit itself is fraudulent and that the signatures of BRJ representatives on the agreement are forgeries. First, Augusto de Queiroz declares that BRJ did not issue the alleged letter of credit, (Aug. 5 Augusto Decl. ¶ 10), and both Augusto and Claudio de Queiroz confirm that the signatures that appear above their names on the document are not their own, but rather are forgeries. *Id.* ¶¶ 13-14; (Claudio Decl. ¶ 3). For comparison, BRJ has provided several samples of each of their signatures on other BRJ documents. *See* (Aug. 5 Augusto Decl., Ex. A at 9-18; Ex. B at 19-27). The signatures on these sample documents are consistent with one another but bear little resemblance to the signatures that appear on the alleged letter of credit. *See id.*

Second, under standard letter of credit practice, and under the explicit terms of the Alleged Letter of Credit Issuance Agreement, ACP was required to submit an application before BRJ could issue the alleged letter of credit. *See* (Def.'s 56.1 ¶¶ 59-61). Professor Byrne's report states that, "for accounting, compliance, and regulatory reasons, a bank *cannot* issue a letter of credit without an application." (Byrne Report ¶ 44(b)) (emphasis added). However, Dorchester has proffered no evidence showing that such an application was ever made, and as previously discussed, both Augusto and Claudio de Queiroz deny ever having heard of or communicated

8

with ACP. (Aug. 5 Augusto Decl. ¶ 10); (Claudio Decl. ¶ 6). In the absence of an application by ACP, BRJ could not have issued the alleged letter of credit.

Third, the terms of the alleged letter of credit do not match the terms of the Alleged Letter of Credit Issuance Agreement. The Alleged Letter of Credit Issuance Agreement states that the applicant for the letter of credit is ACP, but the applicant listed on the alleged letter of credit itself is "Mr. Jose Luis Cabas Alvarez," whose name appears nowhere on the Alleged Letter of Credit Issuance Agreement. (Def.'s 56.1 ¶¶ 64-65); (Alleged Letter of Credit Issuance Agreement, 1 [Doc. No. 252-1]); (Letter of Credit, 1 [Doc. No. 14-9]). In addition, the Alleged Letter of Credit Issuance Agreement states that the letter of credit will be issued in the amount of $100 million, but the alleged letter of credit itself states that its value is $250 million. (Def.'s 56.1 ¶ 70); (Alleged Letter of Credit Issuance Agreement, 1); (Letter of Credit, 1). BRJ's expert states that errors in terms as crucial as these would not be expected to appear in a legitimate letter of credit. *See* (Byrne Report ¶¶ 47(a), 47(c)). Dorchester has proffered no evidence to explain these significant discrepancies.

Fourth, BRJ's expert identifies numerous terms in the alleged letter of credit either that are inconsistent with standard letter of credit practice, or that contradict one another.  For instance, the alleged letter of credit states that the amount is "due upon maturity but prior to the day of expiration." (Letter of Credit, 1). However, BRJ's expert explains that the terms "maturity" and "due" are not used in legitimate letters of credit, and that these terms do not appear in the Uniform Customs and Practice for Documentary Credit (UCP500), rules to which the alleged letter of credit is subject by its own terms. (Byrne Report ¶ 47(d)). The "due upon maturity" clause also appears to render the letter of credit unusable, as the date of "maturity" and the date of "expiration" are the same, October 17, 2002. *See* (Letter of Credit, 1). The alleged

letter of credit also contain terms such as "assignable," "freely transferrable," and "callable" that, according to Professor Byrne, are not used in legitimate letters of credit and are not used in the UCP500; Professor Byrne states that, based on his experience, these words appear frequently in letters of credit that are fraudulent. (Byrne Report ¶ 47(f)). Finally, the alleged letter of credit is purportedly issued "by order of one of our customer [sic] ACP Investments Limited." However, as discussed previously, Augusto de Queiroz states that ACP was never a customer or client of BRJ. (Aug. 5 Augusto Decl. ¶ 10).

The declared value of the alleged letter of credit also supports the conclusion that the document is inauthentic. As improbable as it is that a bank of BRJ's size would agree to issue a letter of credit for $100 million, as it purportedly agreed to do in the Alleged Letter of Credit Issuance Agreement, it is even more improbable that it would actually issue a letter of credit for $250 million, given that its total asset base is less than half that size.[4] And Augusto de Queiroz states that BRJ has "never entered into a single obligation even close to the $250,000,000 principal amount that is in the purported letter of credit." (Aug. 5 Augusto Decl. ¶ 3).

Finally, the appearance of the document is inconsistent with letters of credit issued by BRJ. For instance, the supposed BRJ seal that appears on the document was not the seal used by BRJ at the time the alleged letter of credit was issued—it does not show BRJ's number of company registry in Brazil. *See* (Aug. 25 Augusto Decl. ¶ 7(a)); (Claudio Decl. ¶ 10(a)).[5] The seal appears six times on the single-page letter of credit, something that BRJ's expert explains is

---

[4] Indeed Dorchester's own expert provides support for this line of reasoning, stating that he "find[s] it *beyond comprehension* that in 2001 a bank of that size could issue a letter of credit for $250 million." (Coker Decl. ¶ 4 [Doc. No. 252-12]) (emphasis added).

[5] These portions of the declarations refer to the seal that appears on the Alleged Letter of Credit Issuance Agreement; however, the seal that appears on that agreement and the seal on the alleged letter of credit are identical in appearance. In addition, the seals that appear on both documents lack the distinguishing feature of the authentic seal used by BRJ in 2001, namely its number of company registry in Brazil. *See* (Aug. 25 Augusto Decl. ¶ 7(a)); (Claudio Decl. ¶ 10(a)).

10

common on letters of credit used in connection with commercial frauds. (Byrne Report ¶ 47(f)). In addition, the font used on the document does not match the font used by BRJ on its own documents, (Aug. 5 Augusto Decl. ¶ 12); the letter of credit number on the document does not conform to the numbering system BRJ uses to issue financial instruments, *id.* ¶ 11; and the document is written in English, whereas the overwhelming number of documents issued by BRJ are written in Portuguese, *id.* ¶ 12; (July 29 Augusto Decl. ¶¶ 15(b), 15(d)).[6]

2. Plaintiff's Evidence

In response to BRJ's evidence that both the Alleged Letter of Credit Issuance Agreement and the alleged letter of credit itself are forgeries, Dorchester offers (1) a SWIFT message purportedly sent by BRJ confirming that the letter of credit had been issued, (Baker Decl., Ex. C [Doc. No. 252-3]); (2) a declaration from Sheila Baker, a former employee of Chase Manhattan Bank, confirming the receipt of the SWIFT message, (Baker Decl., [Doc. No. 252-3]); and (3) a declaration provided by Mr. Don Coker that is presented as an expert report (Coker Decl., [Doc. No. 252-12]).[7,8]

---

[6] In his revised declaration of July 29, 2014, Augusto de Queiroz acknowledged the existence of one legitimate transaction in which BRJ had engaged (the "Map Transaction") that he had overlooked in his prior declaration and that rendered certain statements in his original declaration inaccurate. Specifically, the Map Transaction involved a letter of credit that was issued in English and that contained a number that did not conform to BRJ's standard numbering system. (July 29 Augusto Decl. ¶¶ 6-15).
  Considered in isolation, the use of English in the letter of credit at issue in this case as well as the use of a number that does not conform to BRJ's system would not provide evidence of the document's inauthenticity, because these characteristics had both appeared in at least one valid BRJ letter of credit, i.e., the one at issue in the Map Transaction. However, when considered in combination with other aspects of the alleged letter of credit's appearance and contents, the Court finds that these two facts offer additional relevant evidence in support of the conclusion that the letter of credit is inauthentic.

[7] BRJ argues that Dorchester should be barred from relying on the declaration of Mr. Coker for purposes of summary judgment because Dorchester failed to proffer an expert in accordance with the discovery schedule and failed to submit an expert report in the case. (Second Reply Mem. of Law in Supp. Mot. for Summ. J. ("Reply"), 8 [Doc. No. 255]). Because the statements in Mr. Coker's declaration are not sufficient to create a genuine dispute as to any material fact, the Court does not need to decide whether or not the declaration should be excluded.

[8] Dorchester has also submitted a declaration from T.J. Morrow, its former counsel in this case, (Morrow Decl., [Doc. No. 252-9]), and a declaration from Robert Cox, Dorchester's accountant, (Cox Decl., [Doc. No. 252-10]). However, the declarations do not include any relevant facts concerning the authenticity of the letter of credit documents, but instead pertain to other alleged events surrounding the letter of credit transaction, such as a conference call with two individuals claiming to be BRJ officers, and payments that Dorchester claims it made to

### a. The SWIFT Message

Dorchester has submitted a copy of a message sent through the SWIFT messaging service that was purportedly sent by BRJ to Chase Manhattan Bank to confirm that Dorchester's letter of credit had been issued.[9] (Baker Decl., Ex. C [Doc. No. 252-3]). The message states that "[w]e Banco BRJ S.A. . . . verify that our bank letter of credit . . . beneficiary Dorchester Financial Securities Inc., is authentic. We possess a hard copy of this instrument at our bank." (Baker Decl., Ex. C, at 2). Below the text of the message appear the typed names of "Luiz Augusto de Queiroz" and "Luis Alcazar," both of whom are identified as "Bank Officer," along with identification numbers below each name. *Id.* Dorchester states repeatedly in its briefing that this SWIFT message is legitimate and that it provides "proof of Dorchester's transaction." *See* (Second Mem. of Law in Opp'n to Mot. for Summ. J. ("Opp'n"), 8, 10-13, 16 [Doc. No. 252]). Dorchester also relies on the declaration of Sheila Baker, which states that she was an employee of Chase Manhattan Bank in October of 2001, at which time she retrieved the relevant SWIFT message from the Chase Manhattan Bank Communications Department on behalf of Mr. Morrow. (Baker Decl. ¶¶ 4, 5-9). Dorchester argues that the Baker declaration "confirms receipt of Dorchester's letter of credit at Chase bank." (Opp'n, 8).

However, BRJ cites several reasons to doubt that the SWIFT message is authentic. First, both Augusto and Claudio de Queiroz deny that BRJ sent the SWIFT message that Dorchester received. (Aug. 5 Augusto Decl. ¶ 15); (Claudio Decl. ¶ 12). Augusto and Claudio de Queiroz also state that the SWIFT code that appears beneath Augusto de Queiroz's name is not his

---

BRJ in exchange for the letter of credit (but which are uncorroborated by other evidence such as bank records). *See* (Morrow Decl.); (Cox Decl.). These statements are insufficient to raise a genuine dispute of fact as to the authenticity of the letter of credit.

[9] SWIFT messages are sent through the Society for Worldwide Interbank Financial Telecommunication, a Belgian messaging service that specializes in the transmission of financial messages between banks and other financial institutions. *Dorchester Fin. Sec., Inc.*, 2012 WL 231567, at *2.

SWIFT code or the SWIFT code of any other BRJ employee. (July 29 Augusto Decl. ¶ 15(e)); (Claudio Decl. ¶ 12). And the message identifies Luis Alcazar as a "Bank Officer" of BRJ even though Augusto de Queiroz states that no one named Luiz Alcazar was ever an employee, much less an officer, of BRJ. *Id.* ¶ 15(c).

In addition, the message was sent in the SWIFT MT-999 format.[10] BRJ's expert explains that SWIFT messages sent in this format are generally unreliable and relatively easy to forge. (Byrne Report ¶¶ 24(a), (b)). Unlike authenticated messages, which can be sent only between SWIFT members who have exchanged numerical keys that allow them to communicate with each other in specified message formats, all messages sent in "99" formats are "unauthenticated." *Id.* The MT-999 is a general "free form" message format—similar to an email message—that can be used by any entity with access to the SWIFT system, and can be sent to any SWIFT member without prior consent and without authentication, making it far less secure and reliable. *Id.* ¶ 26. The document Dorchester has submitted showing the SWIFT message supports Professor Byrne's conclusion. The document displays a prominent caution immediately above the text of the message that reads "CAUTION: This message was received unauthenticated. If authentication is required – do not process. Under no circumstances should a financial bearing transaction be processed in response to this message." (Baker Decl., Ex. C at 1).

Finally, Dorchester proffers the declaration of Mr. Coker in support of its contention that the SWIFT message is authentic. Mr. Coker states that, based on his experience and his

---

[10] According to BRJ's expert, SWIFT messages are organized into categories that pertain to the general subject matter of the message; within each of these categories, there are different standard message formats, identified by distinct numbers. (Byrne Report ¶ 24(a)). For example, Category 7 SWIFT messages pertain to letter of credit undertakings, and formats within this category are designated with a 700-series number (e.g. MT-760). *See id.* Within each general SWIFT category, there is a "free format" message form, designated by numbers ending with "99" (e.g. MT-799 or MT-999). *Id.* ¶ 24(b).

13

examination of the message, his "opinion is that either Luis Alcazar or Luiz Augusto de Queiroz or both ordered the message sent to Chase Bank." (Coker Decl. ¶ 4). However, this conclusion is entirely consistent with BRJ's assertion that it did not sent the message, but rather that someone using the name "Luiz Alcazar" sent the message, pretending to act with the authority of BRJ. In addition, Mr. Coker states that the inclusion of the bank name, bank location, and SWIFT codes in the message provide "enough identifying information" to identify the sender. *Id.* However, both the name and location of BRJ are publicly available, and Mr. Coker has no personal knowledge of whether the SWIFT codes that appear in the message are the SWIFT codes of any BRJ officers or employees. Accordingly, Mr. Coker's declaration—even if it were deemed admissible—fails to create a genuine dispute as to whether BRJ sent the SWIFT message. Moreover, even if the Court found that the statements in Mr. Coker's declaration created a genuine issue of fact as to the authenticity of the SWIFT message, which it does not, those statements nonetheless fail to create a genuine issue of *material* fact because Mr. Coker states unequivocally that "[i]n [his] opinion, the letter of credit . . . is fraudulent." (Coker Decl. ¶ 4).

In sum, Dorchester's evidence pertaining to the SWIFT message is insufficient to create a genuine dispute as to the authenticity of the alleged letter of credit or the Alleged Letter of Credit Issuance Agreement.

### b. Dorchester's Remaining Evidence

Dorchester's remaining evidence consists of conclusory allegations that the documents are authentic, and assertions that the testimony of Augusto de Queiroz is not credible. Such assertions are not sufficient to defeat BRJ's properly-supported motion for summary judgment. *See Gottlieb*, 84 F.3d at 518 ("[The non-moving party] cannot defeat the motion by relying on

the allegations in his pleading, or on conclusory statements, or on mere assertions that the affidavits supporting the motion are not credible.").

Dorchester insists repeatedly that the documents upon which it relies are authentic, but it proffers no evidence beyond the documents themselves to support its assertion. For instance, Dorchester states that "Banco did issue a letter of credit," that "[t]he signatures on the documents are real," and that "[t]he Banco seal on Dorchester's letter of credit is real," but cites only to the documents themselves as proof of this assertion. (Opp'n, 13). Similarly, Dorchester claims that it "has records of the relationship with Banco and ACP did apply for and secure a letter of credit from Banco for Dorchester," but it has provided no copies of these alleged records. *Id.* These conclusory statements unsupported by any evidence are not enough to rebut the specific evidence BRJ has proffered to show that the letter of credit is a forgery. Therefore they do not create a genuine dispute of material fact.

Dorchester also repeatedly questions the credibility of BRJ's main witness, Augusto de Queiroz, arguing that Mr. de Queiroz "lacks any credibility whatsoever." (Opp'n 16). But the non-movant "cannot defeat the motion [for summary judgment] by relying on . . . mere assertions that the affidavits supporting the motion are not credible," *Gottlieb*, 84 F.3d at 518, and Dorchester has failed to provide any evidence that creates a genuine dispute as to the material facts regarding the authenticity of the letter of credit about which Augusto de Queiroz testified. Dorchester's attack on the credibility of the Byrne report, on the ground that it is tainted by its reliance on the testimony of Augusto de Queiroz, fails for the same reason. *See* (Opp'n, 3).

In sum, BRJ has produced significant, probative evidence showing that the letter of credit, as well as many of the other documents relied upon by Dorchester, are forgeries. By contrast, Dorchester has failed to offer sufficient evidence for any reasonable fact-finder to

decide in its favor. *See Anderson*, 477 U.S. at 248; *see also Bangkok Crafts Corp.*, 2004 WL 1406076, at *6 ("There are no probative facts adduced to dispute that the signatures . . . are forged, thus rendering the contract void *ab initio*."). Because Dorchester has failed to offer sufficient evidence to show that these documents are valid, a necessary element of its claim, it is unnecessary for the Court to consider any remaining disputes of fact. *See Gottlieb*, 84 F.3d at 519 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)) ("If the undisputed facts reveal that there is an absence of sufficient proof as to any essential element on which the opponent of summary judgment has the burden of proof, any factual dispute with respect to the other elements becomes immaterial and cannot defeat the motion."). Therefore, the Court concludes that summary judgment for Defendant is appropriate.[11]

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. This Opinion and Order resolves docket entry 230.


SO ORDERED.

DATED:   New York, New York
         March 21, 2016

/s/
KIMBA M. WOOD
United States District Judge

---

[11] Because the Court decides BRJ's motion based on the validity of the letter of credit agreement, it does not reach BRJ's remaining arguments, including those presented in the first round of summary judgment briefing.